## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SIERRA CHEATWOOD, <br><br> Plaintiff, <br><br> vs. <br><br> EQUIFAX INFORMATION SERVICES, LLC; TRANS UNION LLC, WORLD ACCEPTANCE CORPORATION; AND SANTANDER CONSUMER USA INC., <br><br> Defendants. | Case No.: **CIV-25-435-DES** <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> 1. **FCRA, 15 U.S.C. § 1681** *et seq.* |

Plaintiff Sierra Cheatwood, ("Plaintiff") through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* against Defendants World Acceptance Corporation ("World Acceptance"); Santander Consumer USA Inc., ("Santander") (referenced collectively as " Furnisher Defendants"), and Defendants Equifax Information Services, LLC ("Equifax"); and Trans Union LLC ("Trans Union") (referenced collectively as "CRA Defendants") (CRA Defendants and Furnisher Defendants together referred to as the "Defendants").

### I.    INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow

instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      Unfortunately, however, this information has also became readily available for, and susceptible to, mishandling and misuse. Individual consumers can, and do, sustain substantial damage, both economically and emotionally, when inaccurate or fraudulent information is disseminated and/or published about them. In fact, CRA Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similarly interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, refinancing, a car or mortgage loan or other forms of credit.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.,* 689 F.2d 72, 79 (6th Cir. 1982) [*quoting* 116 cong. Rec. 36570 (1970)] (*emphasis added*).

8.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy. *See* 15 U.S.C. 1681(a)(4).

9.    Plaintiff's Complaint arises out of the CRA Defendants' blatantly inaccurate credit reporting, wherein Experian reported to Plaintiff's potential creditors that Plaintiff owed money on two tradelines that Plaintiff was no longer legally responsible for while failing to report her bankruptcy in the public records section of her consumer report and

Trans Union reported to Plaintiff's potential creditors two tradelines as discharged in bankruptcy when they had **NOT** been discharged.

10.     Accordingly, Plaintiff brings claims against the CRA Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

11.     Plaintiff's Complaint also alleges that the CRA Defendants also violated 15 U.S.C. § 1681 *et seq.* by failing to reasonably investigate Plaintiff's consumer disputes, which each resulted in the CRA Defendants reporting inaccurate information about Plaintiff.

12.     Plaintiff's Complaint also arises from violations of the FCRA against the Furnisher Defendants for failing to conduct a reasonable reinvestigation after receiving notice of Plaintiff's dispute from one or both of the CRA Defendants.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

14.     Venue in the Eastern District of Oklahoma is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District or are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

### III.    PARTIES

15.    Plaintiff is a natural person who resides in Crowder, Oklahoma and is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

16.    Defendant World Acceptance is a financial institution engaged in the business of giving credit and collecting debt. World Acceptance is also a "furnisher," as contemplated by 15 U.S.C. § 1681s-2. Upon information and belief, World Acceptance is regularly engaged in the business of furnishing credit information to the consumer reporting agencies. World Acceptance is headquartered at 104 Sout Main Street Greenville, South Carolina, 29601. World Acceptance can be served through its registered agent, C T Corporation System located at 1833 South Morgan Road Oklahoma City, OK 73128.

17.    Defendant Santander is a financial institution engaged in the business of giving credit and collecting debt. Santander is also a "furnisher," as contemplated by 15 U.S.C. § 1681s-2. Upon information and belief, Santander is regularly engaged in the business of furnishing credit information to the consumer reporting agencies. Santander is headquartered at 1601 Elm Street STE 800, Dallas, Texas 75201. Santander can be served through its registered agent C T Corporation System, located at 1833 South Morgan Road Oklahoma City, OK 73128.

18.    Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers in the form of "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA

30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

19. Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661. Trans Union can be served through its registered agent, Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, IL 62703.

20. Defendants Equifax and Trans Union regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. The CRA Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. §1681a(f) of the FCRA.

21. During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Oklahoma and conducted business in the State of Oklahoma on a routine and systematic basis.

6

22.    During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

23.    Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional.

24.    Defendants did not maintain procedures reasonably adapted to avoid any such violations.

## IV.    FACTUAL BACKGROUND

### Summary of the Fair Credit Reporting Act

25.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

26.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. §1681(a).

27.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable

to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

28. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. §1681i).

29. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with either or both of their statutory obligations under the FCRA.

### Factual Background

30. The CRA Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day and also sell credit scores.

31. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like CRA Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

32. The CRA Defendants regularly purchase and obtain consumer bankruptcy information to include the consumer reports they sell to third parties for profit.

33. The CRA Defendants' consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii)

Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

34.    The CRA Defendants obtain consumer information from various sources. Some consumer information is sent directly to CRA Defendants by furnishers, and other information is independently gathered by CRA Defendants from third party providers/vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

35.    The CRA Defendants regularly seek out and procure consumer bankruptcy filing and discharge information, with the intention of including such information in the consumer reports CRA Defendants sell to third parties for a profit.

36.    The diligence CRA Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in CRA Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

37.    The CRA Defendants' unreasonable policies, procedures and/or algorithms consistently fail to identify and update public record reporting as required by § 1681(e)(b).

38. The CRA Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in their own files.

39. The vast majority of institutions that offer financial services, e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like the CRA Defendants) to make lending decisions.

40. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in CRA Defendants' reports.

41. The information the CRA Defendants include in consumer reports contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

42. FICO Scores are calculated using information contained in the CRA Defendants' consumer reports.

43. The CRA Defendants know that FICO and other third-party algorithms (including the algorithms owned by the CRAs, including CRA Defendants) use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of their creditworthiness.

44. The CRA Defendants know that FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a. "Payment history" refers to whether a consumer has paid or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

b. The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

45. The CRA Defendants know that lenders also consider a consumer's debt-to-income ratio ("DTI") before deciding to extend credit or approve financing terms.

46. DTI compares the total amount a consumer owes (based on the total amount of debt reported by the CRA Defendants in their consumer reports) to the total amount a consumer earns.

47. A consumer's income, however, is not included in their consumer report; only their amount of debt is. Consumers enter their income into credit applications. Therefore, DTI is not calculated in a consumer's credit score but is a factor in credit decisions.

48.     The higher the amount of reported debt that a consumer has, or is reported to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit. Moreover, if credit is extended at all, consumers will be offered terms for lower credit limits and higher interest rates.

49.     Equifax is aware that DTI plays an impactful role in the evaluation of consumer credit applications, stating on its own website: "Lenders may consider your DTI ratio as one factor when determining whether to lend you additional money and at what interest rate. Generally speaking, the lower a DTI ratio you have, the less risky you appear to lenders."[1]

50.     Similarly, Trans Union is aware that DTI plays an impactful role in the evaluation of consumer credit applications, stating on its own website: "Your DTI can be considered by lenders for a variety of loans, including credit cards, auto loans and mortgages, to name a few. A high DTI may indicate your debt load is too high and it would be risky to lend you additional money. The lower your DTI, the more likely it is you'll be seen as an eligible borrower and can generally expect better loan terms, like lower interest rates."[2]

51.     A consumer who has obtained a bankruptcy discharge and has a discharged account inaccurately reporting with an outstanding or past due balance after the bankruptcy discharge therefore suffers greater harm than if that account was accurately reporting with

---

[1] *Debt-to-Income Ratio vs. Debt-to-Credit Ratio*, https://www.equifax.com/personal/education/credit/score/articles/-/learn/debt-to-income-ratio-vs-debt-to-credit-ratio/

[2] *What Is Debt-to-Income Ratio?* https://www.transunion.com/blog/debt-management/what-is-debt-to-income-ratio?atvy=%7B"264995"%3A"Experience+B"%7D

a zero-dollar balance, especially if that account is a charged off account with a balance asserted to be owed, as is the case here.

52.    The CRA Defendants are well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are discharged.

53.    Despite the availability of accurate consumer information, the CRA Defendants regularly report inaccurate information about accounts after consumers receive a Discharge Order.

54.    The CRA Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

55.    Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, the CRA Defendants frequently report information concerning pre-bankruptcy debts based on information they know is incomplete or inaccurate.

56.    Consequently, the CRA Defendants regularly publish consumer information that conflicts with information: provided by data furnishers to the CRA Defendants, already included in the CRA Defendants' credit files, contained in public records that the CRA Defendants regularly access, and/or sourced through the CRA Defendants' independent and voluntary efforts.

57.    The CRA Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681e(b).

58.    The CRA Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in the CRA Defendants' own files.

59.    The CRA Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including, but not limited to, account balances, account statuses, payment histories, and payment statuses.

60.    Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau (CFPB) complaints against the CRA Defendants for their inaccurate credit reporting following a Chapter 7 discharge.

61.    Thus, the CRA Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures. More specifically, the CRA Defendants are on continued notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and/or payment statuses.

62.    Furthermore, the FCRA entitles consumers, like Plaintiff, to take an active role in the protection of his or her sensitive personal information, by giving the consumer a right to request from consumer reporting agencies like the CRA Defendants "All information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a)(1).

63.    "File," is explicitly defined in the FCRA when applied to consumers, and means, "**all** of the information on that consumer and retained by a consumer reporting agency regardless of how the information is stored." 15 U.S.C. § 1681a(g) (emphasis added).

64.    "Congress clearly intended the protections of the FCRA to apply to all information furnished or that might be furnished in a consumer report" and an FCRA "'file' denotes all information on the consumer that is recorded and retained by a consumer reporting agency that might be furnished, or has been furnished, in a consumer report on that consumer." *Cortez*, 617 F.3d at 711–12 (*citing Gillespie v. Trans Union Corp.*, 482 F.3d 907, 909 (7th Cir. 2007))

65.    When a CRA discloses to a consumer that consumer's file, the disclosure must "clearly and accurately" reflect all the information in that consumer's file at the time of the disclosure. 15 U.S.C. § 1681g(a)(1).

### *Allegations Specific to the Credit Reporting of Plaintiff*

66.    Plaintiff filed for a "no asset" Chapter 7 Bankruptcy on or about January 23, 2025, in the United States Bankruptcy Court for the Eastern District of Oklahoma, petition no. 25-80035.

67.    Plaintiff received an Order of Discharge on or about April 30, 2025.

68.    Thereafter, Plaintiff was not personally liable for her dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

69.    Upon information and belief, the CRA Defendants obtained Plaintiff's public record information from their vendor (e.g. Lexis-Nexis).

70. The CRA Defendants each prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

71. The CRA Defendants reported Plaintiff's credit history, including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the date of the last status update.

72. However, Equifax failed to accurately report Plaintiff's consumer bankruptcy information in the Public Records section of Plaintiff's consumer reports and/or in one or more individual tradelines of Plaintiff's consumer reports.

73. Notably, the other CRAs, Defendant Trans Union and non-party Experian, accurately reported Plaintiff's bankruptcy information in the Public Records sections of their reports, and in the individual tradelines of their reports.

74. Upon information and belief, the CRA Defendants received notice of Plaintiff's bankruptcy discharge through their independent collection of Plaintiff's consumer information through vendors such as Lexis-Nexis, as well as from furnishers that provided data regarding the individual tradelines featured on Plaintiff's consumer reports.

75. The CRA Defendants also obtain information from other CRAs (who commonly share information).

76. The CRA Defendants are aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

77.     Equifax should have reported Plaintiff's bankruptcy filing and discharge information in the public records section of Plaintiff's consumer reports.

78.     The CRA Defendants should have reported all of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 Bankruptcy, and with a zero-dollar balance but did not.

79.     The CRA Defendants should have reported **all** of Plaintiff's dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and with a zero-dollar balance.

80.     Rather than accurately report the discharged debts, the CRA Defendants reported Plaintiff's accounts with numerous inaccuracies.

<u>*Inaccuracies on Plaintiff's Equifax Consumer Report*</u>

81.     On or about May 13, 2025, Plaintiff obtained copies of her Equifax credit report.

82.     Upon review of her Equifax report dated May 13, 2025, Plaintiff observed several inaccuracies.

83.     As a preliminary matter, Equifax did not indicate that Plaintiff had filed for bankruptcy and received a discharge.

84.     The name and address in Plaintiff's Chapter 7 petition match the information listed on her Equifax consumer report and within her Equifax credit file.

85.     Equifax failed to report Plaintiff's bankruptcy discharge even though Equifax had all the correct personal information for Plaintiff in its databases which matched the

personal information reported in Plaintiff's Chapter 7 petition (e.g., full name, social security number, and address).

86.     Notably, non-party Experian and Defendant Trans Union accurately reported Plaintiff's public record and discharged based on the same information.

87.     Additionally, furnishers reported Plaintiff's discharged/zero account balances, bankruptcy and discharge information to Equifax.

88.     Equifax knew or should have known that Plaintiff's bankruptcy was discharged.

89.     Equifax reported debts that were in fact discharged in bankruptcy and were therefore required to report these as discharged and with a zero-dollar balance.

90.     However, Equifax's failure to report Plaintiff's bankruptcy – filed in January 2025 and discharged in April 2025 – in Plaintiff's consumer report contributed to the numerous inaccuracies listed in Plaintiff's Equifax consumer report.

91.     Upon information and belief, the following furnishers of information accurately reported to Equifax that Plaintiff's accounts were included in Plaintiff's bankruptcy discharge and/or had a zero-dollar balance after the bankruptcy filing/discharge, but Equifax rejected or revoked the data furnished to it and inaccurately overrode the reporting of the accounts.

92.     On Plaintiff's consumer disclosure, Equifax inaccurately reported Plaintiff's World Acceptance Corporation account, ending with 7501 and opened in January 2024 (the "World Acceptance Account"), which pre-dated Plaintiff's bankruptcy filing.

93.    The World Acceptance Account was discharged on or about April 30, 2025. Therefore, the World Acceptance Account should have been reported as discharged in bankruptcy.

94.    However, Equifax reported the World Acceptance Account with a status of "Charge-Off".

95.    Additionally, Equifax inaccurately reported Plaintiff's Santander Consumer USA account, ending with 1000 and opened in December 2021 (the "Santander Account"), which pre-dated Plaintiff's bankruptcy filing.

96.    The Santander Account was discharged on or about April 30, 2025. Therefore, the Santander Account should have been reported as discharged in bankruptcy.

97.    However, Equifax reported the Santander Account with a status of "Charge-Off", and with a balance of $12,202.

98.    The status of "Charge Off" in the consumer credit industry means that a debt may still be owed, especially where, as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "charge-off."

99.    Equifax specifically acknowledges that a "Charge Off" generally means consumers are still legally responsible for paying the debt.

100.    According to Equifax, a charge-off means the lender has written the account off as a loss and the account is closed to future charges. The timeframe is generally between 120 and 180 days after a consumer becomes delinquent, and a charge-off does not mean

that the consumer no longer owes the debt; the consumer is still legally obligated to pay the debt.

101. Upon information and belief, Lexis-Nexis furnished information to all three CRAs, including Equifax, that indicated Plaintiff had filed for bankruptcy and received a discharge, but Equifax rejected or otherwise failed to report the data it received.

102. Upon information and belief, some or all of the data furnishers of the foregoing tradelines provided information to all three CRAs, including Equifax, that indicated their corresponding accounts had been discharged in bankruptcy, but Equifax rejected or otherwise overrode the data it received.

103. In addition, public records reflecting Plaintiff's bankruptcy filing and subsequent discharge are readily available to Defendants through multiple sources such as PACER, but CRA Defendants failed to review those sources or knowingly rejected them.

104. In any event, CRA Defendants knew or had reason to know that they reported information contradicted by notices received from third parties.

105. Equifax inaccurately reported that Plaintiff owed money that she did not actually owe and also reported inaccurate account statuses and/or payment histories.

106. Equifax failed to indicate that the World Acceptance Account and the Santander Account (collectively, the "Discharged Accounts") were included in/discharged by Chapter 7 Bankruptcy, and that the Santander Account had zero-dollar balance.

107. Equifax's reporting of Plaintiff's public record information and the Discharged Accounts is patently false/incorrect and therefore inaccurate.

108.    If not patently inaccurate, Equifax's reporting of Plaintiff's public record information and the Discharged Accounts is materially misleading and therefore inaccurate.

### *Inaccuracies on Plaintiff's Trans Union Consumer Report*

109.    On or about May 13, 2025, Plaintiff obtained copies of her Trans Union credit reports.

110.    In the Public Records section of Plaintiff's consumer reports, Trans Union included the bankruptcy case number, court, filing date and the fact that Plaintiff's bankruptcy had been discharged.

111.    Trans Union is well aware that educational benefit loans (i.e., student loans) are statutorily excepted from discharge pursuant to 11 U.S.C. 523(a)(8), unless the debtor can establish excepting the debt from discharge would impose an undue hardship.

112.    Trans Union is further aware that such hardship exceptions are a rare occurrence, and furthermore, information regarding whether a student loan debt has been successfully excepted from discharge is retrievable from the same sources Trans Union obtains the bankruptcy case information.

113.    Additionally, Trans Union receives actual notice of hardship exceptions from furnishers of account/tradeline information.

114.    Trans Union also receives constructive notice of hardship exceptions from furnishers of tradeline information that provide data indicating that a consumer is not continuing to make payments on a pre-bankruptcy debt after receiving their discharge order.

115. In this case, Plaintiff also specifically notified Trans Union that the debt was not discharged, but Trans Union rejected this specific notice, despite also possessing or having access to information that confirmed the debt was in fact not discharged.

116. Although Trans Union was notified of its inaccurate reporting and had the information necessary to correctly report Plaintiff's student loan accounts, Trans Union failed to verify the information.

117. Instead, Trans Union followed unreasonable procedures that allowed it to blindly rely on the furnisher's deficient investigation and report its results, despite possessing conflicting information about the accounts.

118. On Plaintiff's May 13, 2025, Trans Union report, Plaintiff observed that Trans Union inaccurately reported Plaintiff's Department of Education student loan account, starting with 9735 and opened in November 2024 (the "First ED Account") as discharged.

119. Additionally, Trans Union inaccurately reported Plaintiff's Department of Education student loan account, starting with 9735 and opened in November 2024 (the "Second ED Account") as discharged.

120. Trans Union's reporting of the First ED Account and Second ED Account (collectively, the "ED Accounts") was patently false and/or materially misleading as the ED Accounts were not discharged by Plaintiff's bankruptcy.

121. Trans Union failed to report the ED Accounts with accurate statuses.

122. Trans Union reported inaccurate payment statuses that indicate the ED Accounts were included in and/or discharged in bankruptcy, instead of with current statuses.

123. Notably, the other national consumer reporting agencies, Equifax and non-party Experian, did not inaccurately report the ED Accounts like Trans Union.

### *Plaintiff's Disputes*

124. On or about June 2, 2025, Plaintiff sent certified letters to each of the CRA Defendants disputing Equifax's inaccurate reporting of Plaintiff's public record information and the Discharged Accounts, and Trans Union's inaccurate reporting of the ED Accounts.

125. The letter to Equifax specifically advised that Plaintiff's bankruptcy information was not being reported, and further explained that her pre-petition debts, including the Discharged Accounts specifically, were discharged in bankruptcy and had zero-dollar balances.

126. Additionally, Plaintiff's letter to Trans Union specifically advised that the ED Accounts were not part of Plaintiff's bankruptcy discharge and should not be reported with any indication that they were discharged in bankruptcy.

127. Based on the tracking receipts, Equifax and Trans Union each received Plaintiff's dispute letters.

128. Upon information and belief, Equifax forwarded Plaintiff's dispute to the Furnisher Defendants within 5 business days of receipt.

129. Upon information and belief, the Furnisher Defendants each received

Plaintiff's dispute.

130. Equifax did not respond to Plaintiff's dispute.

131. Similarly, Trans Union did not respond to Plaintiff's dispute.

132. On or about August 28, 2025, Plaintiff obtained a copy of her Equifax credit report where she discovered that while Equifax updated the balance of the Santander Account to $0, Equifax nevertheless still failed to indicate that the Discharged Accounts were discharged in bankruptcy and furthermore were still not reporting Plaintiff's bankruptcy in the public records section.

133. That same day, on or about August 28, 2025, Plaintiff attempted to obtain a copy of her Trans Union credit report to see if any of the disputed information had been corrected but was unable to do so.

134. On or about October 7, 2025, Plaintiff mailed a manual request for her Trans Union consumer report as allowed pursuant to 15 U.S.C. § 1681g.

135. In her request, Plaintiff included her personal identifying information, along with a copy of her driver's license, Social Security card, and electric bill.

136. Equifax did not investigate Plaintiff's dispute, and pursuant to its unreasonable procedures, merely forwarded an automated dispute form to the Furnisher Defendants, despite possessing independent information that indicated the Discharged Accounts were discharged and/or the ability to independently verify as much through the same sources it receives consumer bankruptcy information.

137. Trans Union did not investigate Plaintiff's dispute.

138. Alternatively, in investigating Plaintiff's dispute, and pursuant to its unreasonable procedures, merely forwarded an automated dispute form to the furnisher of the ED Accounts, despite possessing independent information that indicated the ED Accounts were not discharged and/or the ability to independently verify as much through the same sources it receives consumer bankruptcy information.

139. Although Equifax could have verified that the Discharged Accounts were discharged through the same sources from which it receives consumer bankruptcy information, it neglected to do so.

140. Similarly, although Trans Union could have verified that the ED Accounts were not discharged through the same sources from which it receives consumer bankruptcy information, it neglected to do so.

141. Rather than perform an investigation based on Plaintiff's dispute based on reasonably available public records and information known by it, Equifax merely parroted information furnished by Furnisher Defendants that indicated the World Acceptance and Santander Accounts were not discharged in bankruptcy.

142. Equifax's failure to report the Discharged Accounts accurately and Trans Union's failure to report the ED Accounts accurately after receiving Plaintiff's disputes is particularly egregious because the CRA Defendants knew the information they reported was factually inaccurate and conflicted with information contained in their own records.

143. The Furnisher Defendants failed to conduct a reasonable investigation after receiving notice of Plaintiff's dispute from Equifax. The Furnisher Defendants failed,

among other things, to review (or intentionally ignored) all relevant information regarding the dispute.

144. Consequently, the Furnisher Defendants continued to furnish inaccurate data to Defendant Equifax despite possessing information from which the Furnisher Defendants could have reported the World Acceptance and Santander Accounts accurately. The Furnisher Defendants' failure to provide Equifax with accurate information is particularly egregious as the Furnisher Defendants were each notified of the inaccurate information through Plaintiff's dispute.

145. The Furnisher Defendants and the CRA Defendants inaccurately reported that Plaintiff owed a balance that Plaintiff did not actually owe and/or also reported inaccurate account statuses and/or payment histories.

146. Equifax and the Furnisher Defendants failed to indicate that the Discharged Accounts were included/discharged in Chapter 7 bankruptcy.

147. Trans Union failed to indicate that the ED Accounts were excluded from/not discharged in Chapter 7 Bankruptcy.

148. The Furnisher Defendants and Equifax's reporting of the Discharged Accounts is patently false/incorrect and therefore inaccurate.

149. If not patently false, the Furnisher Defendants and Equifax's reporting of the Discharged Accounts is materially misleading and therefore inaccurate.

150. Plaintiff specifically notified the Furnisher Defendants and Equifax that the Discharged Accounts were discharged and should be reported as such, but Equifax and the Furnisher Defendants rejected this specific notice.

151. Trans Union's reporting of the ED Accounts is patently false/incorrect and therefore inaccurate.

152. If not patently false, Trans Union's reporting of the ED Accounts is materially misleading and therefore inaccurate.

153. Plaintiff specifically notified Trans Union that the ED Accounts were not discharged and should not be reported as such, but Trans Union rejected this specific notice.

### *Plaintiff's Damages*

154. Upon information and belief, had the CRA Defendants reported Plaintiff's public record and/or credit information accurately, Plaintiff's credit scores and/or DTI would have been better.

155. For example, the Furnisher Defendants' and Equifax's reporting of an additional $12,202 of debt which Plaintiff does not actually owe negatively increases DTI since the debt is substantially greater, but the income is unchanged.

156. The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed bankruptcy.

157. The inaccurate reporting by Equifax suggests to creditors that Plaintiff is guilty of a bad act and was not deserving of receiving a discharge of the World Acceptance and Santander Account.

158.    As a direct result of Defendants' inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

159.    Plaintiff sustained actual monetary damages from the expense of certified mail tracking of Plaintiff's disputes to the CRA Defendants.

160.    As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred, related to Defendants' inaccurate reporting.

161.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, humiliation, stress, anger, frustration, shock, embarrassment, reputational harm, violation of privacy, and anxiety.

162.    Defendants' conduct exacerbated Plaintiff's frustration during the already stressful post-bankruptcy period by hindering Plaintiff's ability to rebuild Plaintiff's credit.

### V.    COUNT I
### CRA DEFENDANTS
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

163.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

164.    The FCRA requires consumer reporting agencies, like the CRA Defendants, to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

165. Equifax received notice of Plaintiff's bankruptcy and discharge through public records, independent collection of consumer information directly obtained by Equifax through sources of consumer information such as Lexis Nexis, Equifax's own files, and information provided by data furnishers, yet Equifax rejected that information.

166. Trans Union independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily reported it in Plaintiff's consumer reports.

167. When Trans Union procured and published Plaintiff's bankruptcy information, it had an obligation to ensure it followed reasonable procedures to report the bankruptcy discharge and its effect(s) with maximal accuracy.

168. These obligations are well established by the plan language of the FCRA, promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving the CRA Defendants from which they are on notice of their unreasonable procedures concerning the reporting of discharged debts.

169. The CRA Defendants knew or should have known that the effect of a Discharge Order in a no-asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

170. The CRA Defendants knew or should have known of their obligations under the FCRA.

171. Additionally, the CRA Defendants possess or could easily obtain substantial written materials that detail CRAs' duties and obligations under the FCRA, including those that apply when a consumer files for Chapter 7 Bankruptcy.

172. The CRA Defendants know that discharged debts should not be reported as late, past due, charged off, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

173. The CRA Defendants also know that debts that are not discharged should not be reported with any indication that they were discharged in bankruptcy and should instead be reported with their current status and payment history.

174. Yet Equifax failed to report Plaintiff's bankruptcy case information, and also inaccurately reported Plaintiff's Discharged Accounts, which each pre-dated Plaintiff's Chapter 7 Bankruptcy, with statuses other than "discharged in bankruptcy" and/or a balance greater than zero.

175. Additionally, Trans Union inaccurately reported Plaintiff's ED Accounts, which are statutorily ineligible for discharge, and in fact were not discharged.

176. Despite knowledge of these legal obligations, the CRA Defendants willfully and consciously breached their duties under the FCRA. Accordingly, the CRA Defendants deprived Plaintiff of her rights under the FCRA.

177. Trans Union had actual knowledge of Plaintiff's bankruptcy and Discharge Order, as evidenced by the information it published in Plaintiff's consumer reports, including the bankruptcy case number, court, date of filing and date of discharge.

178. Individual furnishers of account information also notified the CRA Defendants of Plaintiff's bankruptcy.

179. Yet, in this case, Trans Union inaccurately reported the ED Accounts as discharged in bankruptcy, despite knowing or having reason to know that the ED Accounts were not eligible for discharge and/or were in fact not discharged.

180. Moreover, Equifax regularly conducts voluntary public records searches with the intention of including bankruptcy information on the consumer reports it sells to other parties for a profit.

181. In this case, Equifax knew or should have known about Plaintiff's bankruptcy filing and discharge and failed to include that information in Plaintiff's consumer disclosure and in consumer reports published to third parties.

182. Yet in this case, Equifax failed to report Plaintiff's bankruptcy information and reported the Discharged Accounts with statuses other than discharged in bankruptcy, and/or with a balance, instead of a zero-dollar balance.

183. The CRA Defendants readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

184. The CRA Defendants' inaccurate reporting was particularly egregious because they have the ability to independently confirm that the Accounts were discharged by reviewing their own records or accessing readily available public records.

185. Equifax therefore further failed to follow reasonable procedures, as 15 U.S.C. § 1681e(b) requires, by unreasonably relying on the furnisher, where, as here, Equifax possessed the information confirming that the Discharged Accounts were discharged, including information concerning continued payments, and/or specific notice from Plaintiff.

186. In around 2009, the CRA Defendants implemented their own automated software "bankruptcy scrub" following the settlement agreement in White v. Experian Info. Sols., Inc., No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

187. The CRA Defendants' bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7, even when the furnisher does not update the accounts as discharged.

188. In other words, the CRA Defendants' automated bankruptcy scrub assumes the CRA Defendants' notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition accounts may be reporting inaccurately, and the CRA Defendants will override data reported by a furnisher according to the CRA Defendants' assumptions and algorithms.

189. However, the CRA Defendants have intentionally chosen to disregard knowingly inaccurate open balances and payment obligations of certain types of pre-bankruptcy accounts in the CRA Defendants' software programming of its automated "bankruptcy scrub" they have been employing for well over a decade.

190. Equifax also failed to follow reasonable procedures, as 15 U.S.C. § 1681e(b) requires, by failing to verify that the Discharged Accounts were discharged following Plaintiff's dispute, which information is reasonably available from the same sources Equifax procures consumer bankruptcy information.

191. Similarly, Trans Union also failed to follow reasonable procedures, as 15 U.S.C. § 1681e(b) requires, by failing to verify that the ED Accounts were not discharged

following Plaintiff's dispute, which information is reasonably available from the same sources Trans Union procures consumer bankruptcy information.

192.    The CRA Defendants negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file and consumer reports, and by also failing to report accurate information when the CRA Defendants knew or should have known the information they were reporting is inaccurate, or otherwise contradicted by information known by the CRA Defendants, reported to the CRA Defendants, or reasonably available to the CRA Defendants.

193.    The CRA Defendants' violations of 15 U.S.C. § 1681e(b) were willful.

194.    Alternatively, the CRA Defendants' violations of 15 U.S.C. § 1681e(b) were negligent.

195.    The CRA Defendants' inaccurate reporting damages Plaintiff's creditworthiness.

196.    Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities and other financial harm caused by the CRA Defendants' inaccurate reporting.

197.    Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, loss of sleep, shock, embarrassment, and anxiety.

198.    The CRA Defendants are each a direct and proximate cause of Plaintiff's damages.

199. The CRA Defendants are each a substantial factor in Plaintiff's damages.

200. Therefore, the CRA Defendants are individually liable for actual and statutory damages, punitive damages, and attorneys' fees and costs, as well as other such relief permitted by 15 U.S.C. § 1681, et seq.

**VI.    COUNT II**
**CRA Defendants**
**15 U.S.C. § 1681i**
**Failure to Conduct a Reasonable Investigation of Plaintiff's Dispute**

201. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

202. When a consumer disputes the accuracy or completeness of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information or delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

203. When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

204. Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

205. Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, the CRA Defendants also violated the FCRA by failing to perform a reasonable reinvestigation of the disputed information even after Plaintiff notified them of the inaccurate information in Plaintiff's credit file.

206. The CRA Defendants' violations of 15 U.S.C. § 1681i include, but are not limited to the following:

(a) Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

(b) Failing to consider all relevant information while investigating Plaintiff's dispute.

(c) Failing to include all relevant information when notifying the relevant furnishers of Plaintiff's dispute.

207. Instead of reasonably reinvestigating Plaintiff's dispute, Equifax continued to report Plaintiff's Chapter 7 bankruptcy case information and the Discharged Accounts inaccurately.

208. Instead of reasonably reinvestigating Plaintiff's dispute, Trans Union continued to report the ED Accounts inaccurately.

209. The CRA Defendants' inaccurate reporting damaged Plaintiff's creditworthiness.

210. Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by the CRA Defendants

inaccurately reporting Plaintiff's public record and/or credit information inaccurately, as described herein.

211. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

212. The CRA Defendants are each a direct and proximate cause of Plaintiff's damages.

213. The CRA Defendants are each a substantial factor in Plaintiff's damages.

214. The CRA Defendants' acts, as described above, were done willfully and knowingly; or, alternatively were committed negligently.

215. Therefore, the CRA Defendants are each liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, et seq.

## VII.    COUNT III
### FURNISHER DEFENDANTS
### Violations of the FCRA, 15 U.S.C. § 1681s-2(b)

216. Plaintiff incorporates by reference all the above paragraphs of this Complaint as though fully stated herein.

217. The FCRA requires furnishers of information like the Furnisher Defendants to conduct an investigation with respect to disputed information, review all relevant information, and report the results of the investigation to the consumer reporting agency. If the investigation reveals the information is incomplete or inaccurate, it must report those

results to all consumer reporting agencies to which the furnisher has provided the inaccurate information.

218. The Furnisher Defendants knew or should have known about their obligations under the FCRA. These obligations are well established in the plain language of the FCRA, promulgated by the Federal Trade Commission, and evidenced by case law. The Furnisher Defendants obtained or had available substantial written materials that apprised them of their duties under the FCRA. Despite knowing these legal obligations, Furnisher Defendants acted consciously in breaching their known duties and deprived Plaintiff of her rights under the FCRA.

219. Plaintiff disputed the World Acceptance and Santander tradelines through Equifax.

220. Thereafter, Defendant Equifax forwarded Plaintiff's dispute to the Furnisher Defendants, notifying the Furnisher Defendants that Plaintiff was disputing the information it had furnished about the World Acceptance and Santander Account.

221. The Furnisher Defendants received notice of Plaintiff's dispute and failed to reasonably investigate or otherwise take corrective measures despite possessing all relevant knowledge regarding the dispute.

222. The Furnisher Defendants continue to furnish inaccurate information about Plaintiff to Equifax, even though the Furnisher Defendants possessed all relevant information about the World Acceptance Account and/or Santander Account and the inaccuracy that Plaintiff disputed.

223. The inaccurate reporting of the Discharged Accounts materially and adversely affects Plaintiff's credit standing.

224. On at least one occasion within the past two years, by example only and without limitations, the Furnisher Defendants violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiff's dispute Equifax.

225. The Furnisher Defendants violated sections 15 U.S.C. §§ 1681n and 1681o of the FCRA by engaging in willful and negligent noncompliance of 15 U.S.C. § 1681s-2(a), (b), and engaging in conduct that violates 15 U.S.C. § 1681s-2(a), (b), including:

(a) Willfully and negligently failing to conduct an investigation of Plaintiff's dispute, despite possessing knowledge, information, and records to substantiate Plaintiff's dispute;

(b) Willfully and negligently failing to review all relevant information concerning Plaintiff's dispute;

(c) Willfully and negligently failing to report the results of investigations to the relevant consumer reporting agencies;

(d) Willfully and negligently failing to report to the CRAs that the disputed information is indeed inaccurate;

(e) Willfully and negligently failing to properly participate, investigate and comply with the reinvestigations that were conducted by any and all consumer reporting agencies concerning the inaccurate information disputed by Plaintiff;

(f)   Willfully and negligently continue to furnish and disseminate inaccurate credit, account and other information concerning the Plaintiff to the consumer reporting agencies despite actual knowledge of the falsity of the reported information; and

(g)   Willfully and negligently failing to comply with the requirements for furnishers of information enumerated in 15 U.S.C. § 1681s-2(b).

226.   The Furnisher Defendants unreasonably refused to take corrective measures required by the FCRA to correct and/or update Plaintiff's consumer information furnished to the national consumer reporting agencies.

227.   The Furnisher Defendants are each a direct and proximate cause, as well as a substantial factor in causing damage and harm to Plaintiff.

228.   Consequently, the Furnisher Defendants are liable to Plaintiff for the full amount of statutory, actual and punitive damages, as described herein and as allowable by law. Additionally, Plaintiff is entitled to Plaintiff's attorneys' fees and costs, as well as other such relief permitted by 15 U.S.C. § 1681n and § 1681o.

## VIII.  COUNT IV
### Trans Union's Violations of 15 U.S.C. § 1681g

229.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

230.   Plaintiff requested a copy of his consumer report from Defendant on one or more occasions in or around August 2025.

231. Upon information and belief, Trans Union failed to provide Plaintiff with a copy of her consumer report upon receiving Plaintiff's request(s).

232. 15 U.S.C. § 1681g requires that consumer reporting agencies supply consumers with all information in their file at the time they make that request, including the source of that information.

233. Trans Union is liable to Plaintiff under § 1681g for failing to provide Plaintiff with her consumer report and the source of the inaccurate information concerning the ED Accounts it included in Plaintiff's consumer report upon receipt of Plaintiff's request(s).

234. As a result of Trans Union's conduct, action and inaction, Plaintiff suffered actual damages which have been further described above.

235. Trans Union's of the FCRA were willful and knowing. Further, Trans Union's violations were committed in reckless disregard of Plaintiff's rights as a consumer. Accordingly, Trans Union is liable for Plaintiff's statutory, actual, and punitive damages pursuant to 15 U.S.C. § 1681n.

236. Alternatively, Trans Union's violations of the FCRA were negligent, rendering it liable for Plaintiff's statutory and actual damages pursuant to 15 U.S.C. § 1681o.

237. In any event, Trans Union is liable for Plaintiff's reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n, 1681o.

## IX.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgments against Defendants for the following:

(a)    Declaratory judgment that the CRA Defendants violated the FCRA, 15 U.S.C. § 1681e(b) and § 1681i;

(b)    Declaratory judgment that Defendant Trans Union violated the FCRA, 15 U.S.C. § 1681g;

(c)    Declaratory judgment that the Furnisher Defendants violated the FCRA, 15 U.S.C. § 1681s-2(b);

(d)    An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(e)    An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(f)    An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2),

(g)    Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(h)    Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## X.    JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this December 1, 2025,

By: */s/ Beth K. Findsen*
Beth K. Findsen, AZ No. 023205
**CONSUMER JUSTICE LAW FIRM PLC**

41

8095 N. 85th Way,
Scottsdale, AZ 85258
E: bfindsen@consumerjustice.com
T: 602-807-6676
F: 480-613-7733

*Attorneys for Plaintiff*
*Sierra Cheatwood*